United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REARDEN LLC, et. al.,                           No. C 06-07367 MHP

      Plaintiffs,

      v.                                           **AMENDED**[1]
                                                    **MEMORANDUM & ORDER**
REARDEN COMMERCE, INC.,                         **Re: Cross-Motions for Summary Judgment,**
                                                    **Evidentiary Motions, and Motions to Seal**
      Defendant.

_____/

16   On November 30, 2006 plaintiff Rearden LLC and affiliated companies (collectively "the

17   Rearden companies" or "plaintiffs") filed this action against Rearden Commerce, Inc. ("RC" or

18   "defendant"), alleging six causes of action relating to twelve trade names and one trademark all

19   incorporating the word "Rearden." Specifically, plaintiffs allege the following: (1) false designation

20   of origin under section 43(a) of the Lanham Act; (2) illegal cybersquatting under the Anti-

21   Cybersquatting Consumer Protection Act, 15 U.S.C., section 1125(d); (3) common law state

22   trademark infringement; (4) corporate name infringement; (5) false advertising under California

23   Business and Professions Code, section 17500; and (6) unfair competition under California Business

24   and Professions Code, section 17200.

25   Now before the court are the parties' cross-motions for summary judgment. Plaintiffs move

26   on claims one and four and defendant's affirmative defenses. Defendant moves on plaintiffs' claims

27   one, three, four, five and six. Having considered the parties' arguments and for the reasons stated

28   below, the court enters the following memorandum and order.

1  BACKGROUND

2  I.      Plaintiff Rearden LLC

3          Stephan Perlman ("Perlman") founded Rearden Steel, Inc., in 1999 as the first of what

4  became several affiliated Silicon Valley-based companies. Perlman Amended Moving Dec. ¶ 16.

5  Rearden Steel, Inc., was incorporated in California in May 1999. Id., Exh. A. The Rearden

6  companies are technology incubators and artistic project production companies. Id.[2] For example, in

7  2004, the companies incubated Ice Blink Studios LLC, a full-service art and design studio that

8  contributed to the production of several motion pictures, including *The Polar Express* (2004),

9  *Monster House* (2005) and *War of the Worlds* (2005). See Second Amended Complaint at 4-5. The

10 Rearden companies are also credited with the development of the Moxi Media Center, a device for

11 televisions which incorporates Internet connectivity, digital video recording, a DVD player, a music

12 jukebox, and wireless video distribution in one set-top box. Perlman Amended Moving Dec. ¶ 20.

13         The following chart summarizes the Rearden companies' apparent succession of name

14 changes and incorporations:

15

| 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|------|------|------|------|------|------|------|------|
| Rearden Steel, Inc. | ⟶ | | Rearden Studios, Inc. | ⟶ | Rearden, Inc. | ⟶ | **Rearden LLC** |
| | Rearden Steel Entertainment, Inc. | ⟶ | Rearden Entertainment, Inc. | | ⟶ | Rearden Studios, Inc. ⟹ | **Rearden Studios LLC** |
| | Look Aside Productions, Inc. | ⟶ | Rearden Productions, Inc. | | | · | **Rearden Productions LLC** |
| | | **Rearden Properties LLC** | ⟶ | | | | **Rearden Properties LLC** |

23 See id. ¶¶ 5-15.

24         Today, there are four Rearden entities: (1) Rearden LLC; (2) Rearden Productions LLC; (3)

25 Rearden Studios LLC; and (4) Rearden Properties LLC. Id. ¶¶ 1, 4, 44. The flagship entity, Rearden

26 LLC, provides the resources necessary to support the ground-up development of new ventures.

27 O'Shea Moving Dec., Exh. 14 at 9-22. Rearden Productions LLC and Rearden Studios LLC

28

United States District Court
For the Northern District of California

1  specialize in high definition and animated movie production services. Id. Rearden Properties LLC is
2  a property ownership and management company whose sole source of income is the rental of three
3  units in a building at 355 Bryant Street, in San Francisco, to the other Rearden companies. Id.;
4  O'Shea Moving Dec., Exh. 30. The Rearden companies own the following U.S. registered
5  trademark:



11  Perlman Amended Moving Dec. ¶ 41. The Rearden companies also filed "intent-to-use" trademark
12  applications for the marks, "Rearden," "Rearden Companies," "Rearden Commerce Email," and
13  "Rearden Personal Email," on May 31, 2007. O'Shea Opp. Dec., Exhs. 15-18.

14      The Rearden companies have offices in San Francisco and Palo Alto, California. Yurasek
15  Moving Dec., Exh. J at 4; http://www.rearden.com/contact/index.html (last visited Dec. 29, 2008).[3]
16  Their combined staff consists of around one hundred employees. Yurasek Moving Dec., Exh. J at 4.
17  The Rearden companies have also continuously operated a host of websites, including:
18  "reardensteel.com" since November 1999; "rearden.com" since April 2001; "reardenstudios.com"
19  since March 2002; and "reardenlabs.com" since May 2005. Perlman Amended Moving Dec. ¶ 46.

20      As an incubation platform, the Rearden companies provide new ventures with funding as
21  well as management and infrastructure support, including office space, personnel, equipment,
22  information technology infrastructure, insurance, administrative and travel services, benefits,
23  marketing, and intellectual property advice. Id. ¶ 16. In some cases, the companies contract with
24  third parties to provide this support. Id. ¶ 21. For example, a human resources company, TriNet,
25  partners with Rearden to provide online access to payroll and benefits management services, along
26  with internet points of sale for air travel, hotel accommodations, car services, dining reservations,
27  and event tickets. Id.

28

United States District Court
For the Northern District of California

3

II.     Defendant Rearden Commerce

Rearden Commerce is the Silicon Valley-based creator of a proprietary web-based technology called the "Rearden Personal Assistant." The Rearden Personal Assistant links subscribers, namely professionals and existing businesses, to an online marketplace where they can search for, compare and purchase a variety of business and travel-related services from more than 130,000 venders, such as American Airlines, Hertz, Hilton, and WebEx. O'Shea Moving Dec., Exh. 3 at 3-4. The services are comprehensive and may encompass air and car travel, event tickets, dining reservations, web conferencing, and package shipping. Id. at 3.

Rearden Commerce caters to the needs of traveling business people and employers. As an example, the Rearden Services Console enables managers and administrators of travel, procurement, and other key departments to "implement and enforce policies, manage suppliers and contracts and guide employees to the right service choices at the point of purchase." Id. at 4.

Perlman first learned of Rearden Commerce in 2006 after a trademark watch service notified him that defendant sought registration of the mark "Rearden Commerce" and the logo pictured below. Perlman Amended Moving Dec. ¶ 49; O'Shea Moving Dec., Exh. 5.



This notification came after Rearden Commerce had already filed trademark applications with the U.S. Patent and Trademark Office ("PTO") one year earlier, in March 2005. See O'Shea Moving Dec., Exhs. 4 & 5. Although Rearden contested the applications after it received notice, the PTO nevertheless approved the registration. See PTO Website, http://www.uspto.gov/main/ trademarks.htm (search "Rearden Commerce" using trademark search functionality).

Prior to becoming "Rearden Commerce" in 2005, defendant operated under two other designations. First, defendant chose the name "Gazoo Corporation" in 1999 when Patrick Grady

4

1 ("Grady") originally founded the company. Two years later, Gazoo changed its name to "Talaris

2 Corporation." See Yurasek Moving Dec., Exh. QQ at 2, Exh. WWW. In 2004, Grady commenced

3 the re-branding of Talaris to "Rearden Commerce." Id., Exh. QQ. Grady described the rationale for

4 the name change as follows:

> "Talaris" has never registered with anyone, the name is often
> mispronounced and it only reflects the 'personal assistant' metaphor, not
> the real overarching value and vision. It is also difficult to build a culture,
> image and brand from it. Lastly, we haven't built any brand equity as we
> have stayed largely in stealth mode since '02 . . . unlike Talaris which
> narrowly defines us, 'Rearden' Commerce however, is a fundamentally
> sound symbol/reflection/metaphor for us in every way.

9 Id.

10 Grady contacted Perlman and asked to purchase the Internet domain "www.rearden.com."

11 Perlman Amended Moving Dec., Exh. LL. Perlman declined Grady's offer and contested Rearden

12 Commerce's trademark registration. Id. ¶¶ 49, 50, Exh. MM. Several days later, Grady and Perlman

13 spoke over the phone; however, the discussions were fruitless and the Rearden companies filed this

14 action. Id.

15

16 LEGAL STANDARD

17 Summary judgment is proper when the pleadings, discovery, and affidavits show that there is

18 "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

19 of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case.

20 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is

21 genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

22 party. Id. The party moving for summary judgment bears the burden of identifying those portions of

23 the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material

24 fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party

25 will have the burden of proof at trial, the moving party need only point out "that there is an absence

26 of evidence to support the nonmoving party's case." Id.

27

28

United States District Court
For the Northern District of California

5

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

## DISCUSSION

Plaintiffs move for summary judgment on their first and fourth claims and on defendant's affirmative defenses. Defendant moves for summary judgement on all claims except the second claim (illegal cybersquatting) and the sixth claim insofar as it relates to the second. The crux of plaintiffs' arguments is simple: defendant's use of its similar name and logo threatens to create, and has in fact created, confusion among the relevant consuming public.

Plaintiff's federal and state trademark infringement claims are subject to the same test. Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir. 2008). "The critical determination is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." Id., quoting Brother Records, Inc. v. Jardine, 318 F.3d 900, 908 (9th Cir. 2003) (internal quotations omitted). Moreover, plaintiff's trademark and trade name claims are governed by the same standard. The law governing trademarks and trade names falls under the broader umbrella of unfair competition. See New West Corp. v. NYM Co., 595 F.2d 1194, 1201 (9th Cir. 1979). Under the Lanham Act, a trademark is defined as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his *goods* and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127 (emphasis added). Trade names, in contrast, are "individual names and surnames, firm names and trade names used by manufacturers, industrialists, merchants, agriculturists, and others to identify their *businesses*, vocations, or occupations . . . ." Id. (emphasis added). To put it another way, a trademark identifies the *source* of particular goods and services, for example a brand name;

6

whereas, a trade name represents the *reputation* of the goods and services produced. See Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1534, 1536 (9th Cir. 1989). "The major legal distinction between trademarks and trade names is that trade names cannot be registered and are therefore not protected under 15 U.S.C. § 1114.  However, analogous actions for trade name infringement can be brought under section 43(a) [of the Lanham Act]." Id. at 1534 (citations omitted).  Despite the nuance in terminology, the law governing trademarks and trade names is practically indistinguishable in its application.  See id. at 1534-35 ("[T]he same broad standards of protection apply to trademarks as trade names . . . both preclude one from using another's distinctive mark or name [in a way that] will cause likelihood of confusion or deception as to the origin of the goods . . . courts faced with challenges to both trademark and trade name usage . . . apply the same multifactor likelihood of confusion test"); see also Am. Steel Foundries v. Robertson, 269 U.S. 372, 380 (1926); McCarthy on Trademarks and Unfair Competition § 9:1.  The same "likelihood of confusion" test applies to plaintiffs' trademark and trade name claims.[4]

The first step in the analysis is to determine whether there is any genuine issue of material fact as to whether the Rearden companies have used "Rearden" in commerce so as to give rise to a protected right.  If so, then it is necessary to establish whether there is a genuine issue of material fact regarding whether RC's use of "Rearden" creates a likelihood of confusion.

I.      Use in Commerce

The threshold question is whether plaintiffs have a valid, protectable interest in the mark and names at issue.  See Brookfield Comm. Inc. v. West Coast Ent. Corp., 174 F.3d 1036, 1047, 1053 (9th Cir. 1999).  At common law and by statute, trademark rights are established through use, not registration or mere adoption.  See Sengoku Works Ltd. v. RMC Int'l Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); 15 U.S.C. § 1125(a) ("Any person who . . . uses in commerce any word, term, [or] name . . . which is likely to cause confusion . . . shall be liable in a civil action . . . .");  Accuride at 1539-40 ("Under the California Trade Name Statute, Cal. Bus. &

7

Prof. Code §§ 14400-14416, the first entity to file articles of incorporation . . . *and use* the corporate name set forth in the articles or certificate, is entitled to a presumption that it has an exclusive right to use that name within California.") (emphasis added).

Under the Lanham Act, a trademark is deemed to be in use when "it is used in the ordinary course of trade, and not made to merely reserve a right in a mark." 15 U.S.C. § 1127. Specifically, a trademark that designates the provision of a service, as opposed to a good, is considered to be in use when "it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Id. This well-established "use in commerce" requirement comports with the basic purpose of a trademark and trade name, namely to help consumers in the relevant marketplace "identify a business and its products or services, to create demand for those products or services, and to protect the company's good will." Accuride at 1536. Nevertheless, the strong emphasis placed by courts on actual commercial use has yielded in recent years to allow protection where the totality of circumstances establishes a right to use the trademark. See Chance v. Pac-Tel Teletrac, Inc., 242 F.3d 1151, 1158-59 (9th Cir. 2001) ("[T]rademark rights can vest even before any goods or services are actually sold if the totality of one's prior actions, taken together, can establish a right to use the trademark.") (citations omitted); see also Brookfield at 1052; New West at 1200. The factually-dependent "totality of circumstances" test largely turns on "evidence showing, first, adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind." Brookfield at 1052.

It is appropriate to examine whether plaintiff's use of the word "Rearden" is sufficient to give rise to a protected right. If adequate use were found for "Rearden," it would be possible to analyze whether a likelihood of confusion is created with respect to *any* of plaintiffs' names, since all incorporate the word "Rearden." Moreover, defendant often refers to itself simply as "Rearden," thereby emphasizing the word "Rearden" alone. See Yurasek Moving Dec., Exh. XXX (press release issued by defendant calling itself "Rearden"); id., Exh. GGG, HHH (describing various products and services as the "Rearden Personal Assistant," the "Rearden Services Console" and the "Rearden Merchant Network"); id., Exh. BBBB (links to articles posted on defendant's website referring to defendant as "Rearden").

8

United States District Court

For the Northern District of California

1
2
3
4
5
6
7

Plaintiffs first established use of the name "Rearden" in 1999 after incorporating Rearden Steel, Inc. Perlman Amended Moving Dec. ¶¶ 5-15. Since 1999, plaintiffs have used "Rearden" in connection with certain commercial transactions, including: (1) plaintiffs' securing of $67 million in funding for Rearden Steel Technologies in 2001; (2) plaintiffs' payment for incubation services provided to Ice Blink Studios in 2004; and (3) plaintiffs' receipt of $12.5 million in revenue for the sale of a minority interest in an incubated start-up in 2007. Perlman Amended Moving Dec. ¶¶ 18, 20, 33. The name "Rearden" has also been ascribed to plaintiffs in numerous news articles.[5]

8
9
10
11
12
13
14
15

Notably absent from the record is any evidence that Rearden has marketed any products or services to consumers using the Rearden name. At oral argument, defense counsel stated that the Rearden companies have served only to incubate Perlmann's ideas and that no one actually pays Rearden to have their ideas incubated. Plaintiffs' counsel did not challenge that characterization, other than to state that outside persons "could" come to Rearden. See Docket No. 233 (Transcript of Proceedings, Oct. 10, 2008) at 31:14. If the Rearden entities merely use the name amongst themselves but do not market any good or service under the name, the fact that they have consistently used the name does not necessarily mean that it has been used in commerce.

16
17
18
19
20
21
22
23

On the other hand, defendant's contention that plaintiffs specifically and publicly abandoned the Rearden mark is without foundation in the record. Defendant cites to plaintiff responses to an interrogatory and a request for admission, see O'Shea Moving Dec., Exh. 14 at 8-14, Exh. 8 at Response 20, as evidence that plaintiffs "admitted" they had abandoned "Reardon Steel" at the 2002 Consumer Electronics Show. These exhibits do not support such a finding. Plaintiffs specifically denied abandoning "Rearden Steel, Inc.," instead admitting an announcement that one entity, "Rearden Steel Technologies," would change its name to Moxi Digital Inc. O'Shea Moving Dec., Exh. 8 at Response 20.

24
25
26
27

Nevertheless, even under the "totality of circumstances" analysis, see Chance at 1158-59, it is questionable whether plaintiffs' activities amount to a public use of the Rearden name and mark, especially given the apparent lack of actual customers of any product. Because the "likelihood of confusion" analysis below is dispositive of the instant motions, the court assumes without deciding

28

9

that plaintiffs have raised a triable issue of fact as to whether their use of the Rearden name and mark constitutes public use.

## II.    Likelihood of Confusion

Once a protected right is recognized, plaintiffs must show that defendant's use of the mark and names at issue creates a likelihood of confusion among consumers. See Jada Toys, 518 F.3d at 632 ("[T]he critical determination is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product.") (citations and internal quotations omitted); see also 15 U.S.C. § 1125(a). This "likelihood of confusion" analysis is the relevant test for all claims at issue here. See New West at 1201 ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[:] is there a 'likelihood of confusion?'").

The Ninth Circuit has identified eight factors relevant to determining whether confusion is likely: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. See AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). The Ninth Circuit analyzes both federal and state trademark claims using these "Sleekcraft factors." See Jada Toys at 632. A likelihood of confusion determination may rest on all eight factors or, alternatively, on only those factors that are most pertinent. See Surfvivor Media, Inc. v. Survivor Productions, 406 F.3d 625, 631 ("[T]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them."); see also Brookfield at 1054. In assessing the likelihood of confusion to the consuming public, the standard used by the courts is "the typical buyer exercising ordinary caution." Sleekcraft at 353. "Likelihood of confusion is a factual determination. Therefore, a district court may grant summary judgment . . . only if no genuine issue exists regarding likelihood of confusion." Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894 (9th Cir. 2002) (internal quotations omitted).

10

1  Plaintiffs contend that defendant infringes on the Rearden Studios trademark as well as

2  several trade names, including "Rearden," "Rearden LLC," "Rearden Productions," "Rearden

3  Studios," and "Rearden Properties."[6]

### i. Strength of Mark

6  A strong mark "is inherently distinctive, for example, an arbitrary or fanciful mark" and is

7  "entitled to a greater degree of protection than a weak one, because of its unique usage." Sleekcraft

8  at 349; Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 341, 350 (9th Cir. 1980). A

9  weak mark is merely descriptive and is protected only when secondary meaning is shown.

10  Sleekcraft at 349. But rather than a strictly binary division between "strong" and "weak" marks,

11  trademarks fall into a spectrum comprising five categories. "The two strongest sets of marks are

12  'arbitrary' or 'fanciful' marks, which trigger the highest degree of trademark protection. . . ."

13  Surfvivor at 631-632 (internal citations and quotations omitted). Arbitrary marks are common words

14  having no connection with the actual product. Fanciful marks, for example "Kodak" or "Aveda," are

15  coined phrases also having no commonly know connection with the product at hand. Id. at 632.

16  Marks falling into a third category, "suggestive" marks, "do not describe the product's features but

17  suggest them. . . . The exercise of some imagination is required to associate a suggestive mark with

18  the product." Id. The fourth and fifth categories of trademark are "descriptive" and "generic" marks,

19  respectively. Id. The use of similar marks by third-party companies in the relevant industry weakens

20  the mark at issue. M2 Software, Inc. v. Madacy Ent., 421 F.3d 1073, 1088 (9th Cir. 2005).

21  Plaintiffs' marks are plainly not generic or descriptive, and defendant has not argued to the

22  contrary. However, plaintiffs' contention that "Rearden" is arbitrary and fanciful misses the mark as

23  well. Rearden is an actual family name, not a coined term like "Aveda." Moreover, it is hardly

24  arbitrary: a primary business niche of the Rearden companies is the incubation of entrepreneurial

25  new businesses. "Rearden" and "Rearden Steel" invoke an image of entrepreneurial success to the

26  many businesspeople familiar with Ayn Rand's *Atlas Shrugged*. In that novel, Hank Rearden, the

27  founder and owner of several successful businesses including "Rearden Steel," is a paragon of

28  entrepreneurial success:

11

United States District Court
For the Northern District of California

[A]t a small distance of miles, the words of a neon sign stood written on the blackness of the sky: REARDEN STEEL. . . . [Hank Rearden] thought that in the darkness of this night other signs were lighted over the country: Rearden Ore—Rearden Coal—Rearden Limestone. He thought of the days behind him. He wished it were possible to light a neon sign above them, saying: Rearden Life.

Ayn Rand, *Atlas Shrugged* at 37 (Signet 1992).

For better or worse, Atlas Shrugged has sold over six million copies and has been enormously influential among industrialists and entrepreneurs.[7] It takes but small "exercise of some imagination," see Surfvivor at 632, to associate the "Rearden" mark with services that incubate and support new business. Thus, "Rearden" is best categorized as a suggestive mark, which is protected though not triggering "the highest degree of trademark protection." See id. at 631.

Defendant has argued that plaintiffs' marks are weak because over 840 companies use the word "Rearden" or some variation of the word in their names. See Second Amended Complaint at 10-11. It is the "[u]se of similar marks by third-party companies *in the relevant industry* [which] weakens the mark at issue." M2 Software at 1088 (emphasis added). In this case, only four entities among the 840 identify themselves as technology or engineering consulting firms.[8] Id. at 10. Further, each of these four employs less than five people, in contrast to plaintiffs' one hundred-plus person staff. Id.; Yurasek Moving Dec., Exh. J at 4.

The "Rearden" mark is relatively strong, and this factor weighs somewhat in favor of finding a likelihood of confusion.

ii. Proximity of Services

Consumers are more likely to be confused when "the users of similar marks or names sell related goods." Accuride, 871 F.2d at 1536. In other words, the closer the parties are in competitive proximity, the higher the likelihood of confusion.

Plaintiffs maintain that defendant's Rearden Personal Assistant software directly competes with plaintiffs' incubation and/or movie production services. In support, plaintiffs raise several arguments. First, plaintiffs argue that defendant is a close competitor because defendant, like plaintiffs, is fundamentally "a technology infrastructure company." See Pl.'s MSJ at 17. Second, plaintiffs suggest that defendant's business directly overlaps with plaintiffs' business because both

United States District Court
For the Northern District of California

parties use "Cloud Computing." Third, plaintiffs argue that because defendant operates in the same general industry as plaintiffs, close competitive proximity should be implied. Finally, plaintiffs suggest that the "one-stop-shop" branding it shares with defendant compels a finding of close competitive proximity. Each of these arguments fails.

Plaintiffs label defendant's business at an extraordinarily high level of abstraction as "a technology infrastructure company." This description conflates a means with an end. It is true that each party relies to some extent on technology infrastructure to support its business platform; however, the end services produced by plaintiffs and defendant are completely different. Plaintiffs provide access to office space, personnel, equipment, information technology infrastructure, funding, insurance, and administrative services. In contrast, defendant offers customers access to an online forum where customers can themselves compare and procure business and travel related services. Although plaintiffs may offer, as *part* of its incubation service, a means for clients to arrange business and travel-related services through a third-party, TriNet, this is entirely different from defendant's use of proprietary technology to create a web-based marketplace solely for the purchase of such services. Plaintiffs offer no evidence that they themselves provide a web-based marketplace for business and travel-related services. The dissimilarity of the services offered distinguishes the case at bar from a recent case heavily relied upon by plaintiffs, Palantir Technologies, Inc. v. Palantir.Net, Inc., 2008 WL 152339 (N.D. Cal. 2008) (Breyer, J.). In Palantir, the court issued a preliminary injunction against Palantir Technologies, finding that Palantir.Net had established a high likelihood of success on the merits of its trademark infringement claims under the Sleekcraft test. In that case, the similar services found to be offered by the parties were not simply software or computer-based services, which would sweep in countless companies in this district and the country. Rather, both parties specifically analyzed and managed databases for large government and private clients. See id. at *6. Rearden and RC's products may not be as dissimilar as guns and toys, see id., but they are much less similar than database management and database management.

Similar logic compels the court to reject plaintiffs' argument that defendant's primary business is "Cloud Computing"—a term used to describe a software-as-a-service (SAAS) platform for the online delivery of products and services. See Perlman Amended Moving Dec. ¶ 22. Once

United States District Court
For the Northern District of California

again, plaintiffs erroneously conflate a platform by which defendant launches its end service to consumers (i.e., software) with the end product itself (i.e., a web-based marketplace). Indeed, plaintiffs state that it is the technology developed on the SAAS platform that will likely compete with other SAAS/Cloud Computing companies. Plaintiffs do not discuss the product itself, but merely the underlying platform used to create it.

Plaintiffs also argue that because plaintiffs and defendant operate in the same general industry of internet technology, the parties' businesses are necessarily highly competitive. But the test for related goods is not necessarily whether the services themselves are related, but whether the public might assume the services come from the same source. See Entrepreneur Media v. Smith, 279 F.3d 1135, 1147 (9th Cir. 2002). Even assuming, *arguendo*, that defendant operates in the same general industry as plaintiffs, overlap in general industry "does not however render the business so closely related as to suggest strongly a likelihood of confusion." Id. at 1148.

Finally, plaintiffs raise the argument that they, like defendant, tout "one-stop-shop" technology. The labels that parties choose to affix to their businesses are relative, idiosyncratic, and too easily manipulated to serve as a basis for finding close competitive proximity. Moreover, the notion of "one stop" shopping is hardly novel; countless retailers, both of the bricks and mortar and virtual varieties, advertise under such a slogan. The key question is what consumers are shopping *for* (if anything). Plainly, consumers of defendant's products and consumers of plaintiffs' products, such as there may be, are shopping for vastly different things.

Just as the parties' services do not necessarily overlap, their potential customer bases are also inherently distinct. Plaintiffs' incubation services primarily target entrepreneurs in the early phases of operations and corporate buyers interested in capitalizing or purchasing an incubated company. See Perlman Amended Moving Dec. ¶¶ 16-20. By contrast, defendant's web-based marketplace is designed to serve clients, including established businesses, that are seeking to streamline and simplify the management of employee travel and benefits. See O'Shea Moving Dec., Exh. 3. Thus, the needs of plaintiffs' and defendant's customers are fundamentally different.

In light of strong differences in the parties' principal businesses, plaintiff has raised no issue of material fact as to whether the parties are competitors. No reasonably prudent consumer seeking

14

United States District Court
For the Northern District of California

1   to obtain start-up support for an entrepreneurial venture would mistake defendant's online

2   marketplace for plaintiffs' incubation service, particularly considering the relative sophistication of

3   such a consumer (see below). By the same token, no reasonably prudent consumer seeking a web-

4   based means to search, compare and purchase a variety of business services, including air travel,

5   package shipping, audio and web conferencing, dining, car services, and event tickets, would mistake

6   plaintiffs' start-up incubation services for defendant's online personal assistant. Cf. Palantir at *6

7   (explaining that a consumer might confuse the plaintiff's website with the defendant's, since the

8   website of the infringer noted that the company offered software for analyzing data, just as the

9   trademark owner did). A reasonable fact-finder could not possibly conclude, based on the evidence

10  presented, other than that the parties' principal lines of business vastly differ. This factor weighs

11  strongly against a finding of likelihood of confusion.

12

13              iii.    Similarity of Mark and Name

14      Similarity of marks is "tested on three levels: sight, sound, and meaning . . . similarities

15  weigh more heavily than differences." Sleekcraft at 351. Plaintiffs argue that its mark and names

16  are highly similar to those of defendant because of the existence of a common word, "Rearden." In

17  opposition, defendant contends that the inclusion of the word "Commerce" adequately distinguishes

18  defendant's name from plaintiffs' names, which also incorporate differentiating words such as

19  "Productions," "Entertainment" and "Properties."

20      No ordinarily prudent consumer could be confused by the two logos at issue. The primary

21  color motif of Rearden Studios's logo is blue and black, while that of Rearden Commerce is red and

22  black. The Rearden Studios logo features a prominent figure of an "Amazon" warrior, while the

23  Rearden Commerce logo features no figure of a person whatsoever, but instead a stylized "R." See

24  figures below.

25

26

27

28

 

The similarity of name between "Rearden Commerce" and the names of the various "Rearden companies is stronger. "Rearden" is prominent in all of these names. Moreover, like "Rearden Commerce," many of the Rearden companies' names, excluding the ubiquitous "LLC," comprise two words, e.g., "Rearden Productions," "Rearden Properties." However, this degree of similarity is not uncommon among business that offer different goods and services. As defendant notes, it is not uncommon for multiple companies to use names and marks containing common elements. For example, there are six well-known companies respectively named Johnson & Johnson, Johnson Publications, Howard Johnson's, Johnson Controls, Johnson Products, and S.C. Johnson. While plaintiffs's and defendants' names are similar, their similarity is not great in comparison with the similarity common among companies offering different goods and services. This factor weighs somewhat in favor of a finding of likelihood of confusion.

### iv.   Evidence of Actual Confusion

Evidence that use of a mark or name has already caused actual confusion as to the source of a product or service is "persuasive proof that future confusion is likely." Sleekcraft at 352. The focus is confusion with respect to the source of a product or service. See Entrepreneur Media, 279 F.3d at 1151 ("To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of a product."). However, actual confusion is hard to prove, so the absence of such evidence is generally not noteworthy. Brookfield at 1050.

Plaintiffs argue that actual confusion has already occurred. In support of their claim, plaintiffs cite an extensive list of incidents involving: (1) confusion by authors of trade publications; (2) confusion by organizers of the Web 2.0 Expo trade show; (3) confusion by plaintiffs' vendors; (4) confusion by plaintiffs' legal representatives and auditor; and (5) miscellaneous incidents of confusion. See Perlman Amended Moving Dec. ¶¶ 60-81 (and exhibits referenced therein). A closer examination of plaintiffs' evidence, however, reveals that in each case, confusion occurred with respect to the parties' *names* or affiliation, but never occurred with respect to the source of the parties' *products* or *services*.

16

1        Nearly every example in the record implicates a vendor or an industry insider.  The critical

2  determination for finding a likelihood of confusion is whether *prospective purchasers* are likely to be

3  deceived, regardless of the experiences of vendors, industry insiders, and job-seekers.  See Accuride,

4  871 F.2d at 1535 ("The critical focus of the likelihood of confusion inquiry is . . . the effect of

5  defendant's usage of the name on prospective purchasers in the marketplace.").[9]

6        Of the many incidents cited by plaintiffs, only two involve actual confusion on the part of a

7  member of the relevant consuming public.  In the first, QubicaAMF, a customer of defendant,

8  expressed confusion as to which "Rearden" it conducted business with, after QubicaAMF received a

9  subpoena for this lawsuit.  Yurasek Moving Dec. ¶ 51, Exh. RRR at 54-55.  In the second incident,

10  plaintiffs allegedly received dozens of misdirected emails originally intended for defendant, some of

11  which were sent by defendant's customers.  Perlman Amended Moving Dec. ¶ 68.  Both examples

12  once again illustrate confusion with respect to the parties' names and not confusion over the question

13  of what party provides which sort of services.  Further, with respect to the second example, it is

14  likely that the misdirected emails were simply misaddressed: a sender likely erroneously typed

15  "@rearden.com" into the address field instead of "@reardencommerce.com."  Such an error may

16  indicate confusion as to the proper address for routing email, but it provides no evidence one way or

17  the other whether or not the sender had an understanding of the difference between Rearden and RC

18  and their respective products and services.

19        It would be unreasonable for any finder of fact to conclude that the consuming public has

20  already experienced confusion with respect to plaintiffs' and defendant's business services.  This

21  factor does not support a finding of likelihood of confusion.

22

23                     v.    Overlapping Marketing Channels

24        The Ninth Circuit has held that "[c]onvergent marketing channels increase the likelihood of

25  confusion."  See Sleekcraft at 353.  Accordingly, plaintiffs argue that defendant's marketing

26  channels overlap with those of plaintiffs' because both parties use the Internet to market their

27  services.  This argument must be rejected, because *some* use of the Internet for marketing does not,

28  in itself, constitute overlapping marketing channels.  See Entrepreneur Media at 1151.  Instead, the

United States District Court
For the Northern District of California

17

1   proper inquiry relates to "whether both parties use the Web as a *substantial* marketing and
2   advertising channel . . . and whether the parties' marketing channels overlap in any other way."  Id.
3   The vast majority of companies today utilize some form of an Internet site and, therefore, this factor
4   alone cannot be determinative.  Plaintiffs' conclusory statement that the parties use the Internet as a
5   marketing channel, coupled with insufficient supporting evidence, raises no question of material
6   fact.[10]

7           Plaintiffs also argue that the same trade publications report on the parties, thereby indicating
8   an overlap.  Trade publications run the gamut from those narrowly focused on a particular sub-
9   specialty to those dedicated simply to "technology."  The simple fact that some industry publications
10  have a broad enough scope to cover both types of business is insufficient, of itself, to provide
11  evidence of overlapping marketing channels.

12          Plaintiffs point to the fact that both parties have participated, and may continue to participate,
13  in the Web 2.0 Expo, a tradeshow held in San Francisco and in other locations.  The Web 2.0 Expo
14  is "a conference and tradeshow for the rapidly growing ranks of designers and developers, product
15  managers, entrepreneurs, VCs, marketers, and business strategists who are embracing the
16  opportunities created by Web 2.0 technologies."  Web 2.0 Expo website, www.web2expo.com (last
17  visited Oct. 9, 2008).  As such, the event is an opportunity for parties who utilize Web 2.0
18  technologies to network and recruit talent.  See id.  The function does not primarily serve as a means
19  to market to potential customers, given the sole business-to-business participation and the sheer
20  variety of corporations who participate.  See Web 2.0 Expo San Francisco website,
21  http://en.oreilly.com/webexsf2008/public/content/home (last visited Oct. 9, 2008) (listing numerous
22  and varied sponsors, including Microsoft, IBM, salesforce.com, Adobe, and effectiveui).  Plaintiffs'
23  participation in the Web 2.0 Expo was largely driven by a "key goal [of] recruiting for Rearden
24  Labs."  O'Shea Moving Dec., Exh. 59 (Perlman intra-office email).  The common participation in
25  the Web2.0 Expo provides scant relevant information suggesting an overlap in marketing channels.

26          Finally, plaintiffs point to defendant's geographical proximity to plaintiffs: defendant's place
27  of business falls within twenty-five miles of plaintiffs' location.  In the context of Silicon Valley, this
28  observation has little import.  There are multitudes of companies in Northern California that sell an

United States District Court

For the Northern District of California

1   extraordinary variety of goods and services to customers all over the world via the internet. The

2   required showing that these companies actually use overlapping marketing channels cannot be made

3   on the basis of mere geographical proximity.

4       A finder of fact could not reasonably conclude that the parties' marketing channels

5   substantially overlap. This factor weighs against a finding of likelihood of confusion.

6

7             vi.    Degree of Consumer Care

8       Likelihood of confusion is determined from the standpoint of a "reasonably prudent

9   consumer." Brookfield at 1060. Expectations for the reasonably prudent consumer are largely based

10   on his or her level of sophistication and the nature of the goods and services involved. For example,

11   "[w]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases"

12   and "[w]hen the buyer has expertise in the field, a higher standard is proper." Sleekcraft at 353.

13       Here, plaintiffs concede that the prospective purchasers of incubation and movie production

14   services, namely entrepreneurs and corporate enterprises, are sophisticated consumers. That some

15   "industry insiders" have in the past mistakenly assumed an association between plaintiffs and

16   defendant does not undermine a conclusion that the parties' customers exercise a high degree of care

17   in making purchases. Plaintiffs' customers are knowledgeable professionals, not unlike the

18   purchasers of defendant's personal assistant software. Both parties' prospective customers may be

19   expected to exercise a high degree of care in consumption decisions. Consequently, this factor

20   weighs strongly against a finding of likelihood of confusion.

21

22             vii.    Defendant's Intent

23       The law regarding intent is well established: If an alleged infringer "adopts his designation

24   with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may

25   be sufficient to justify the inference that there are confusing similarities." Pacific Telesis v. Int'l

26   Telesis Comm., 994 F.2d 1364, 1369 (9th Cir. 1993), quoting Restatement of Torts § 729, Comment

27   f (1938). Where the alleged infringer knowingly adopts a mark or name similar to another, the court

28   may choose to presume an intent to deceive the consuming public. See Sleekcraft at 354.

1    Plaintiffs argue that defendant acted in bad faith when it adopted the name "Rearden
2  Commerce" despite having knowledge that plaintiffs are located within close proximity to defendant
3  in Silicon Valley. Defendant disputes the charge of bad faith, but does not dispute this knowledge.
4  Instead, defendant claims that it selected the name, "Rearden Commerce," because of Grady's own
5  fondness for Ayn Rand's Hank Rearden. Yurasek Moving Dec., Exh. QQ at 2-3. Indeed, the record
6  is simply devoid of evidence suggesting an intent to deceive the consuming public. At the time
7  defendant chose "Rearden Commerce," it apparently thought plaintiffs had abandoned the "Rearden"
8  marks. An allegation of bad faith alone, without supporting evidence, is insufficient to create a
9  question of material fact. The court accordingly rejects plaintiffs' argument that defendant acted in
10  bad faith with an intent to confuse consumers, to deliberately infringe on plaintiffs' name, or to ride
11  the coattails of plaintiffs' purported notoriety.

12    Plaintiffs also argue that defendant acted in bad faith when it surreptitiously registered
13  domain names derived from minor variations of plaintiffs' name, "Rearden LLC," and directed
14  traffic from those sites to defendant's own website. See Perlman Moving Dec., Exh. NN, OO, PP
15  (describing defendant's alleged registration of "www.reardenllc.net" and "www.reardenllc.com").
16  This allegation relates to the cybersquatting claim not at issue in this motion, not to whether
17  defendant's initial decision to change its name to "Rearden Commerce" was made in good faith.
18  There no basis for a reasonable fact-finder to conclude that the defendant acted in bad faith.

19

20                viii.    Expansion of Products

21    "A strong possibility that either party may expand his business to compete with the other will
22  weigh in favor of finding that the present use is infringing." Sleekcraft at 354. Plaintiffs argue that
23  defendant intends to expand its business into plaintiffs' realm, notably into the mobile devices
24  market.  In support of this claim, plaintiffs assert that defendant's CEO, Grady, made a statement to
25  the effect that Grady envisions a world where all types of applications and services can connect with
26  defendant's personal assistant platform. See Pf.'s MSJ at 22. Plaintiffs cite Exhibit OOO to
27  Perlman's Amended Declaration; however, that exhibit contains 61 pages of text and no readily
28  apparent reference to or by Grady. Plaintiffs' failure to specify the location in the record of this

United States District Court
For the Northern District of California

20

1  alleged comment discounts it as evidence. See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)
2  ("It is not our task, or that of the district court, to scour the record in search of genuine issue of
3  triable fact."); see also Orr v. Bank of America, 285 F.3d 764, 775 (9th Cir. 2002). Furthermore,
4  such a vague comment by itself provides no basis to conclude that either party will expand into the
5  other's line of business. This is particularly true where plaintiffs have not articulated any particular
6  intent to expand. Coupled with the fact that the parties' services are largely distinct, lack of evidence
7  of product expansion diminishes the likelihood of confusion. This factor weighs against a finding of
8  likelihood of confusion.

9

10            ix.    Summary

11         On this record, the court finds that: (1) plaintiffs' mark and names hold moderate strength;
12  (2) plaintiffs and defendant are non-competitors because their principal lines of business vastly
13  differ; (3) defendant's name bears a marked resemblance to plaintiffs'; (4) plaintiffs' evidence does
14  not indicate confusion with respect to the relevant consuming public; (5) the parties' marketing
15  channels do not substantially overlap; (6) the parties' prospective purchasers exercise a high degree
16  of care in making consumption decisions; (7) plaintiffs' evidence is insufficient to prove that
17  defendant acted in bad faith; and (8) plaintiffs' evidence is insufficient to prove that the parties'
18  intend to expand their businesses to directly compete with each other.

19         In sum, viewing factual inferences in the light most favorable to plaintiffs, no reasonable jury
20  could find that defendant's use of "Rearden" creates a strong likelihood of confusion in the minds of
21  the relevant consuming public. A fortiori, the use of "Rearden" could not, as a matter of law, be
22  considered "false and misleading," as required to find a violation of the California Business and
23  Professions Code, section 175000. Thus, the court finds in favor of defendant on all claims at issue
24  in this motion: one, three, four, five, and six to the extent that claim six relies upon trademark
25  infringement, rather than cybersquatting. The disposition of these motions makes it unnecessary to
26  analyze the merits of defendant's affirmative defenses. The court also defers judgment on the
27  question of which affirmative defenses might apply to the remaining cybersquatting claim, since the
28  issues involved in that claim have not been briefed.

III.    Evidentiary Objections

Plaintiffs have objected to certain proffers of evidence accompanying defendant's motion and opposition. See Docket Nos. 171 & 204. Similarly, defendant has moved to strike certain proffers of evidence accompanying plaintiffs' papers. See Docket Nos. 167 & 196. Defendant's motions to strike are mooted by the disposition of the cross-motions for summary judgment. Plaintiffs' objections to the O'Shea Moving Declaration, paragraphs 3, 57, 76 and 79, and accompanying exhibits, and the O'Shea Opposition Declaration, paragraphs 1, 3, 36, 42, 51 and 54, and accompanying exhibits, are DENIED. The rest of plaintiffs' thirty separate objections are SUSTAINED. Each of the denied objections is based upon the nonsensical proposition that an attorney cannot authenticate a print-out from a publicly accessible website. Plaintiffs repeatedly object that O'Shea "has no personal knowledge of any of the information contained" in the exhibits. O'Shea's declarations are not offered for the purposes of testifying to the substance of the various news articles and documents—they are offered to authenticate the source of those documents, i.e., that they were actually downloaded from the internet addresses indicated.

The disposition of plaintiffs' objections does not affect the disposition of the cross-motions for summary judgment, as the court does not rely upon any of the (tangentially relevant) declarations or exhibits to which plaintiffs object in reaching its decision.

IV.    Motions to Seal

This is a public court of law, not a private tribunal. The local rules provide for the sealing of documents "*only* upon a request that establishes that the document, or portions thereof, is privileged or protectable as a trade secret or otherwise entitled to protection under the law." Civil Local Rule 79-5 (emphasis added). An email is not a "trade secret" merely because it is sent or received by a high-ranking official of a company. The parties' motions to seal are GRANTED ONLY with respect to the following items:

•    Unreadacted versions of briefs;

•    Yurasek Moving Declaration (redacted version filed as Docket Number 130) Exhibits S, AA, JJJ;

22

1 • Perlman Amended Moving Declaration (redacted version filed as Docket Number 145) Exhibit FFF;

2

3 • O'Shea Revised Moving Declaration (redacted version filed as Docket Number 151) Exhibits 23, 24, 27, 30;

4 • O'Shea Opposition Declaration (redacted version filed as Docket Number 163) Exhibits 24, 25, 26, 27, 33;

5

6 • Yurasek Opposition Declaration (redacted version filed as Docket Number 175) Exhibit BBBB;

7 • Perlman Opposition Declaration (redacted version filed as Docket Number 176) Exhibits C, PP.

8

9 Motions to seal any other document are DENIED.

10

11 CONCLUSION

12 For the reasons stated above, defendant's motion for summary judgment is GRANTED and

13 plaintiffs' motion for summary judgment is DENIED.

14 Plaintiffs' objections to evidence are SUSTAINED IN PART and DENIED IN PART, as

15 described above. Defendant's motions to strike are DENIED. Plaintiffs' and defendant's motions to

16 seal are GRANTED IN PART and DENIED IN PART, as described above.

17

18 IT IS SO ORDERED.

19

20 Dated: January 23, 2009

21 MARILYN HALL PATEL
United States District Court Judge
22 Northern District of California

23

24

25

26

27

28

23

1

**ENDNOTES**

2    1. An earlier version of this memorandum and order was entered on January 14, 2009. Docket No. 234.
Due to a word processing error, the endnote references in that document were incorrect. This amended
3    memorandum and order corrects this mistake. It makes no substantive amendments to the text or
endnotes.

4

2. Plaintiffs' papers do not clearly indicate which Rearden affiliate performs incubation services and
5    whether this function overlaps among entities. Thus, when speaking about plaintiffs' incubation
services, the court will refer generally to "the Rearden companies."

6

3. The court takes judicial notice of contents of this website and other websites cited herein pursuant
7    to Federal Rule of Evidence 201.

8    4. At various points, plaintiffs appear to argue that defendant has addressed only the claims for
trademark infringement while ignoring the claims for trade name infringement. See Pf.'s Reply at 1-4;
9    Pf.'s Opp. to Def.'s MSJ at 7-8. Plaintiffs do not, however, elucidate any legal distinction in the analysis
for trademarks and trade names. The cases plaintiffs quote, see, e.g., Accuride Int'l v. Accuride Corp.,
10   871 F.2d 1531 (9th Cir. 1989); Am. Petrofina v. Petrofina of California, Inc., 596 F.2d 896 (9th Cir.
1979), treat trademarks and trade names the same.

11

5. Plaintiffs' list of articles includes, in part: "Gambits and Gadgets In the World of Technology," Wall
12   St. J. (May 1999); "Internet Meets the Large Screen," N.Y. Times (May 17, 2007); "A Laboratory Tool
Kit for Converting DVD Movies," N.Y. Times (June 28, 2007); "The Richest of the Rich, Proud of a
13   New Gilded Age," N.Y. Times (July 15, 2007). See Second Amended Complaint ¶ 9.

14   6. Plaintiffs cite a total of twelve names infringed that incorporate the word "Rearden" including eight
names not previously mentioned: "Rearden Commerce Email," "Rearden Companies," "Rearden
15   Entertainment," "Rearden, Inc.," "Rearden Labs," "Rearden Personal Email," and "Rearden Steel." See
O'Shea Moving Dec., Exh. 31 at 2 . The court focuses its analysis on the four current primary operating
16   entities: "Rearden LLC," "Rearden Productions," "Rearden Studios," and "Rearden Properties."

17   7. See Kimberly Brown, "Ayn Rand No Longer Has Script Approval," N.Y. Times (Jan. 14, 2007)
(noting that six million copies of *Atlas Shrugged* have been sold); Cullen Murphy, "My Way," The
18   Atlantic (Nov. 2002) ("In a 1991 survey by the Library of Congress and the Book of the Month Club,
which asked readers to name books that had 'made a difference' in their lives, *Atlas Shrugged* came in
19   second, after the Bible."). Apparently, some companies have also named themselves after another *Atlas
Shrugged* hero, John Galt. See "Ayn Rand's Literature of Capitalism," N.Y. Times (Sep. 15, 2007)
20   (mentioning companies named John Galt Corporation and John Galt Solutions).

21   8. The four other technology-related "Rearden" entities are: Lester Rearden (Chattanooga, TN);
Rearden Development Corp. (Grand Rapids, MI); Rearden Industries (Pensacola, FL); and Reardon
22   Consulting Services (Schererville, IN). See Second Amended Complaint at 10-11.

23   9. Plaintiffs argue that confusion of investors, vendors, and suppliers can support a finding of
infringement, even in the absence of consumer confusion. Plaintiffs rely upon a treatise, McCarthy on
24   Trademarks and Unfair Competition, section 23:5. While the treatise reports some cases in which courts
considered the confusion of non-consumers, its discussion is notably devoid of any Ninth Circuit case
25   law suggesting that non-consumer confusion is relevant. This court is bound to apply the law of the
Ninth Circuit, whose precedents clearly hold that the key inquiry is confusion of prospective purchasers.
26   Neither does Ball v. Am. Trial Lawyers Assoc., 14 Cal. App. 3d 289 (1971), cited by plaintiffs' counsel
at oral argument, provide support for the proposition that vendor or supplier confusion gives rise to a
27   claim. In that case, the court held that it was error for the lower court to consider only whether members
of the bench and bar would be confused by the name of a lawyer's professional association, rather than
28   also considering whether the average member of the public – "the ultimate consumer" of legal services
– might be confused. Id. at 308.

United States District Court
For the Northern District of California

24

10. In light of this court's finding that the parties do not use the Internet as a substantial marketing channel, the <u>Perfumebay.com</u> "controlling troika" analysis is inapplicable.  <u>See</u> <u>Perfumebay.com v. EBAY, Inc.</u>, 506 F.3d 1165, 1173 (9th Cir. 2007).