1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REARDEN LLC, et al.,                              No. C 06-7367 MHP

        Plaintiffs,

  v.                                                  **MEMORANDUM & ORDER**

REARDEN COMMERCE, INC.,                **Re:  Cross-Motions for Summary Judgment as to Cybersquatting claims**

        Defendant.

_____/

On November 30, 2006 plaintiff Rearden LLC and affiliated companies (collectively "Rearden" or "plaintiffs") filed this action against Rearden Commerce, Inc. ("RC" or "defendant"), alleging numerous causes of action relating to twelve trade names and one trademark, all of which incorporate the word "Rearden."  Now before the court are the parties' cross-motions for summary judgment regarding impermissible cybersquatting under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and unfair competition under California Business and Professions Code section 17200 as it relates to cybersquatting.  Having considered the parties' arguments and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND[1]

Unless otherwise noted, the following facts are taken from the parties' joint statement of undisputed facts.  *See* Docket Nos. 268, 273 (JSUF).

Steve Perlman first began using the term "Rearden" in May 1999 when he founded Rearden LLC's predecessor, Rearden Steel, Inc.  Since 2001, the company currently known as Rearden LLC and its predecessors have continuously owned the domain name Rearden.com.  Rearden Studios,

**United States District Court**
For the Northern District of California

Inc., affiliated with Rearden LLC, sought trademark protection for its "Rearden Studios" mark with the Patent and Trademark Office on April 20, 2002, and received federal trademark registration on November 1, 2005.

On April 22, 2004, Patrick Grady, defendant's CEO, declared that he wanted to rename the company "Rearden Inc." or "Rearden Software." Two weeks later, on May 6, 2004, RC commissioned a trademark availability search that revealed that other companies had "published" trademarks and "pending" trademark applications for marks and names containing the word "Rearden," including Rearden Studios and Rearden Steel. In December 2004, Grady was informed that "Steve Perlman ex Web TV owns the name Rearden Steel and that he will cause us a lot of problems" and that "there is a guy who has a small thing called Rearden Steel, the one who started Web TV. That might confuse folks in the beginning."

The next month, January 2005, defendant changed its company name to "Rearden Commerce, Inc." On March 4, 2005, RC registered the following *families* of domain names: ReardenInc (ReardenInc.net, ReardenInc.org and ReardenInc.us); ReardenCo (ReardenCo.com, ReardenCo.net, ReardenCo.org and ReardenCo.us) and ReardenC (ReardenC.net, ReardenC.org and ReardenC.us). RC does not have a federally registered trademark for the terms "ReardenInc," "ReardenCo" or "ReardenC," and its only use of these domain names is to direct them to its main website, ReardenCommerce.com.

One and a half years later, on October 8, 2006, Grady at RC contacted Perlman at Rearden about purchasing the Rearden.com domain. Two days later, Perlman replied stating: 1) the domain name was not for sale; 2) he had obtained an extension of the review period for RC's "Rearden Commerce" trademark application; and 3) he was considering seeking a further extension to decide whether to oppose the application. From October 26 until October 31, 2006, RC's general counsel Gabriel Sandoval and Rearden's outside counsel Trent Norris exchanged seven emails regarding the trademark filing extension entitled "Re: Rearden LLC." On October 31, 2006, Sandoval agreed to Rearden's request for a sixty-day extension to consider whether or not to oppose RC's trademark application.

2

United States District Court

For the Northern District of California

At the end of October 2006, Sandoval instructed his employees to register both ReardenLLC.com and ReardenLLC.net.  At this time, Sandoval was aware both that Perlman's company was a limited liability company ("LLC") and that RC was not and had never been an LLC.  Nor were there any plans regarding RC becoming an LLC.  Indeed, RC does not and has not ever used the phrase "Rearden LLC" to refer to or describe its business, and neither party has applied for a federally registered trademark for "ReardenLLC."  Sandoval testified that "there's no written policy" for registering domains, "processes were informal," "a lot of it's haphazard," and "there was no rhyme or reason to it."

On October 31, 2006, RC registered ReardenLLC.com.  On November 6, 2006, RC registered ReardenLLC.net.  On November 10, 2006, RC registered ReardenMobile.com and MobileRearden.com.

Plaintiffs filed suit on November 30, 2006.  Starting immediately thereafter, from December 1, 2006 onward, RC directed both ReardenLLC.com and ReardenLLC.net to their main website, ReardenCommerce.com.  This direction continued for six months—until June 6, 2007—at which time, RC deactivated the forwarding on both these domain names.  They remain dormant to this day.

On May 31, 2007 Rearden filed intent-to-use trademark applications with the Patent and Trademark Office for the marks "Rearden Companies," "Rearden," "Rearden *Commerce* Email," "Rearden Personal Email," "Rearden Mobile," "Rearden Wireless" and "Rearden Communications." (emphasis added).

On June 11, 2007, Rearden accused RC of cybersquatting in ReardenC.com; however, RC did not own that domain name at the time.  The next day RC bought that domain name.

On August 14, 2007, Rearden  moved for a preliminary injunction to prevent RC from using domain names containing "ReardenLLC."  Docket No. 65 (Motion).  This motion was unopposed on the merits, and on September 14, 2007, this court granted Rearden's motion.  Docket No. 77 (Order).

Rearden moves for summary judgment regarding the ReardenLLC domain names under the ACPA and California's unfair competition law, and RC moves for summary judgment regarding all fifteen domain names discussed above claiming its acquisitions did not violate the ACPA.

3

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986).  A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.* at 248.  The court may not make credibility determinations.  *Id.* at 255.  The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial.  Fed R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 250.

DISCUSSION

In 1999, Congress passed the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting.

> [C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.

*DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004) (internal quotations omitted).  In other words, "Cybersquatting is the Internet version of an unlawful land grab.  Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to come forward and pay for the right to engage in electronic commerce under their own name."  *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002).

The ACPA, which protects both federally-registered marks and common law marks, states:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the   goods or services of the parties, that person (i) has a bad faith intent to profit

4

from that mark . . . ; and (ii) registers, traffics in, or uses a domain name [that is confusingly similar to another's mark or dilutes another's famous mark].

15 U.S.C. § 1125(d)(1)(A).[2]  Thus, a "trademark owner asserting a claim under the ACPA must establish the following:  (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit."  *Bosley Medical Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) (quotations omitted).  Only prongs one and five are disputed.  Each is discussed in turn, followed by a discussion of California's unfair competition law.

I.     Valid trademark

The threshold question is whether plaintiffs have a valid, protectable interest in the mark and names at issue.  *Brookfield Comm. Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1047, 1053 (9th Cir. 1999).  At common law and by statute, trademark rights are established through use, not registration or mere adoption.  *See Sengoku Works Ltd. v. RMC Int'l Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); 15 U.S.C. § 1125(a) ("Any person who . . . uses in commerce any word, term, [or] name . . . which is likely to cause confusion . . . shall be liable in a civil action . . . ."); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539–40 ("Under the California Trade Name Statute, Cal. Bus. & Prof. Code §§ 14400-14416, the first entity to file articles of incorporation . . . and use the corporate name set forth in the articles or certificate, is entitled to a presumption that it has an exclusive right to use that name within California.").

Under the Lanham Act, use in commerce requires "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  Specifically, a trademark that designates the provision of a service, as opposed to a good, is considered to be in use when "it is used or displayed in the sale or advertising of services *and* the services are rendered in commerce, . . . ."  *Id.* (emphasis added).  "For both goods and services, the

5

United States District Court

For the Northern District of California

1   'use in commerce' requirement includes (1) an element of actual use, and (2) an element of display."

2   *Chance v. Pac-Tel Teletrac, Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001).

3          Plaintiffs claim a protected right in the mark "Rearden."[3]  In order to meet the "use in

4   commerce" requirement, they must demonstrate that they have used or displayed their mark in the

5   sale or advertising of services.  15 U.S.C. § 1127.  There is some evidence that plaintiffs use the

6   "Rearden Studios" mark in marking their products or services.  *See* Docket No. 250 (Perlman Dec.),

7   ¶ 18 & Exh. K (Rearden Studios advertising Audio Post Facilities, Video Post Facilities, HD Post

8   Facilities and Film Editing Facilities in the "Reel Directory," a Northern California resource for

9   film, video and multimedia services published in July 2005).  Plaintiffs' entry in the July 2005 "Reel

10  Directory"—whose circulation and readership are unknown, but could reach potential

11  customers—could establish use or display "in the sale or advertising of services" along with the

12  rendering of those services in commerce.  15 U.S.C. § 1127.  Rearden Studios also appears to have

13  actually entered into at least one agreement for the provision of electronic services in July 2006.

14  Perlman Dec., ¶ 14 & Exh. G (independent contractor agreement for the provision of "HD Editing

15  Services" to Electronic Arts by Rearden Studios in July 2006).  This could be an example of

16  rendering services in commerce.  15 U.S.C. § 1127.  Since the earliest of these two events is July

17  2005, all domain names acquired by RC prior to that date cannot lead to ACPA liability.[4]

18          The remainder of plaintiffs' evidence regarding "use in commerce" fails to meet the Lanham

19  Act's requirements.  Plaintiffs provide numerous newspaper articles that mention one of the

20  plaintiffs.  Perlman Dec., Exhs. A & N (newspaper articles, mostly regarding Rearden Steel).[5]  These

21  articles either refer to one of the plaintiffs as a holding-company that is "an incubator for new

22  businesses" or mention a plaintiff with no explanation regarding the services offered.  *Id.*  A March

23  26, 2001 article speculates as to what Rearden Steel will do when it "break[s] cover" and that the

24  "Rearden Steel name may not be a keeper . . . ."  *Id.*, Exh. N (Articles).  An April 23, 2001 article

25  mentions that Rearden Steel Studios does "motion capture" work.  *Id.*  None of the articles advertise

26  any services provided by any plaintiff.  They are purely informational.  Similarly, neither an office

27  lease agreement, a contractor agreement nor e-mail services correspondence demonstrate that

28

6

1   plaintiffs used or displayed their mark to potential customers to sell or advertise their services.  *See*

2   *id.*, Exh. O (office license agreement between Rearden Studios and Life Aquatic Productions);

3   Exh. P (independent contractor agreement for administrative, accounting and information

4   technology services between Ice Blink Studios and Rearden Studios); Exh. Q (e-mail services

5   correspondence with no mention of Rearden).

6         Plaintiffs are also credited with providing technology services, which they claim constitutes

7   "use in commerce" under the Lanham Act.  Even if they did constitute use in commerce, much of

8   this evidence is not prior to the July 2005 date established above.  *See Id.*, Exh. H (Rearden Studios

9   credited with providing animation and production for a music video on October 4, 2006); Exh J

10  (credits referring to a plaintiff included in the DVD for the movie "Quality of Life," which,

11  according to email correspondence, does not appear to have been released prior to September 21,

12  2005).  Although plaintiffs provide a DVD cover crediting Rearden Studios with "DVD Design and

13  Editorial" for a DVD with a "Program Content" copyright date of 2005, this does not demonstrate

14  that the DVD was released prior to July 2005.  *Id.*, Exh. F.[6]  The same timing flaw exists with

15  respect to the DVD for "Hope," a year 2005 project.  *Id.*, ¶ 16 & Exh. I.  Plaintiffs do provide the

16  DVD cover of a movie that originally aired on cable television in 2001, and is now available on

17  DVD, that lists one of the Rearden-named entities in the end credits as providing motion capture

18  services.  *Id.*, Exh. E; *see also* JSUF ¶ 43.  This credit, or acknowledgment, for services already

19  performed is not "use[] or display[] in the sale or advertising of services."  15 U.S.C. § 1127.

20  Indeed, the product sought to be sold—the movie or the DVD—had already been acquired when the

21  credits were displayed to the purchaser.

22        Finally, plaintiffs claim the distribution of branded merchandise constitutes "use in

23  commerce" under the Lanham Act.  *See* Perlman Dec., Exh. L (Rearden Steel launch party

24  invitation, with multiple instances of the Rearden Steel mark, allegedly distributed to hundreds of

25  people in or around the year 2000);[7] Exh. M (clothing and other merchandise branded as "Rearden

26  Steel—with no indication regarding products or services—distributed at trade shows from

27  2000–2006).  These activities do not specify the services, if any, performed by plaintiffs.  Even if

28

7

1   these activities could demonstrate that plaintiffs' purported mark was "used or displayed in the sale

2   or advertising of services," they do not demonstrate that any actual "services [were] rendered in

3   commerce." 15 U.S.C. § 1127.

4         In sum, plaintiffs cannot establish a valid, protectable interest in any "Rearden" mark prior to

5   July 2005.[8]  A reasonable jury could, however, find that plaintiffs used the "Rearden Studios" mark

6   as early as July 2005.  Most of the domain names at issue here were acquired by defendant prior to

7   July 2005; therefore, summary judgment is granted in favor of defendant with respect to those

8   domain names, which include all the domain names at issue except ReardenLLC.com,

9   ReardenLLC.net, ReardenMobile.com, MobileRearden.com and ReardenC.com (the "remaining

10  domain names").

11        The court also notes that plaintiffs' use of the "Rearden Studios" mark does not provide

12  plaintiffs *carte blanche* to exclude others from using all marks that incorporate the word "Rearden."

13  Plaintiffs provide no evidence that their use and registration of "Rearden Studios" somehow

14  provides this right.  Although highly unlikely, plaintiffs may somehow be able to demonstrate that

15  they have a protectable interest in any mark beginning with the word "Rearden."  *See Palm Bay*

16  *Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369 (Fed. Cir. 2005)

17  (in the mark "Veuve Clicquot," "Veuve" is a "prominent feature" because it is the first word in the

18  mark as well as the first word to appear on the wine label).  Consequently, the court now considers

19  whether plaintiff can establish that the remaining domain names were acquired in bad faith.

20  II.    <u>Bad faith</u>

21        The ACPA includes nine non-exclusive factors the courts consider when determining

22  whether a party acted in bad faith. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).  Although these factors are

23  strong indicators of bad faith, "the most important grounds for finding bad faith are 'the unique

24  circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress."

25  *Interstellar Starship*, 304 F.3d at 946–47 (citations omitted).  The nine factors are first discussed,

26  followed by a discussion of the unique circumstances of this case and the ACPA's safe harbor

27  provision.

28

United States District Court

For the Northern District of California

A.      ACPA factors

The first bad faith factor is "the trademark or other intellectual property rights of the [cybersquatter], if any, in the domain name . . . ." 15 U.S.C. § 1125(d)(1)(B)(i)(I).  Although defendant RC has not moved this court to establish trademark rights in "Rearden Commerce," there is no doubt that RC uses its mark in commerce, since it provides numerous services via its main website, ReardenCommerce.com.  Indeed, RC has applied for a trademark in "Rearden Commerce," which demonstrates that RC claims some intellectual property rights in domain names incorporating the word "Rearden."  Although RC admits that it "does not and has never used the phrase 'Rearden LLC' to refer to or describe its business," JSUF ¶ 32, it does not disclaim intellectual property rights in domain names that incorporate the word "Rearden."  Since RC has some non-zero intellectual property rights in the word "Rearden," this factor favors RC.

The second factor is "the extent to which the domain name consists of the legal name of the [cybersquatter] or a name that is otherwise commonly used to identify [the cybersquatter]." 15 U.S.C. § 1125(d)(1)(B)(i)(II).  Indeed, "domain names that are abbreviations of a company's formal name are quite common.  To view the use of such names as tantamount to bad faith would chill Internet entrepreneurship with the prospect of endless litigation." *Virtual Works, Inc. v. Volkswagen of America Inc.*, 238 F.3d 264, 269 (4th Cir. 2001).  There is a dispute as to what names are commonly used to identify RC.  Plaintiffs claim it is "Rearden Commerce," whereas defendant claims abbreviations of "Rearden Commerce" are used to identify it.  Defendant's argument is tenable since RC's logo emphasizes "Rearden" and not "commerce."  Docket No. 235 (Infringement Order) at 4.  Moreover, a common identifier for "Rearden Commerce, Inc." would likely be "Rearden" or "ReardenC" as opposed to the longer and more cumbersome "Rearden Commerce."  The fact that "Rearden LLC" is the exact legal name of a plaintiff does not compel a different result because the ReardenLLC domain names also contain the legal name of the cybersquatter.  However, since RC admits that it "does not and has never used the phrase 'Rearden LLC' to refer to or describe its business," JSUF ¶ 32, the ReardenLLC domain names are unlikely to be commonly used

9

United States District Court

For the Northern District of California

to identify RC.  Consequently, this factor marginally favors Rearden with respect to the ReardenLLC domain names, and favors RC with respect to the other three remaining domain names.

The third factor is the cybersquatter's "prior use, if any, of the domain name in connection with the bona fide offering of any goods and services." 15 U.S.C. § 1125(d)(1)(B)(i)(III).  "This factor is not intended to create a loophole that otherwise might swallow the bill, however, by allowing a domain name registrant to evade application of the Act by merely putting up a noninfringing site under an infringing domain name." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) (quoting H.R. Rep. No. 106-412 at 11 (1999)).  RC has been using the remaining domain names at issue, along with scores of similar domain names, for many years to offer non-competing goods and services.  This factor favors RC.

The fourth factor is the cybersquatter's "bona fide noncommercial or fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(d)(1)(B)(i)(IV).  There is no evidence that RC used the domain names for either noncommercial or fair use.  This factor is neutral here because both parties could have some intellectual property rights in the word "Rearden."

The fifth factor is the cybersquatter's "intent to divert consumers from the mark owner's online location" for "commercial gain" or "to tarnish or disparage the mark, by creating a likelihood of confusion . . . ." *Id.* § 1125(d)(1)(B)(i)(V).  There is no dispute that all of the domain names at issue diverted visitors to RC's website.  The issue is whether there was an intent to "divert customers from the mark owner's online location . . . ." *Id.*  This court has held that there does not exist a strong likelihood of confusion amongst the relevant consuming public regarding the products and services offered by the parties.  Infringement Order at 14 ("Plainly, consumers of defendant's products and consumers of plaintiffs' products, such as there may be, are shopping for vastly different things."); *id.* at 15 ("A reasonable fact-finder could not possibly conclude, based on the evidence presented, other than that the parties' principal lines of business vastly differ.").  Thus, due to the lack of confusion, RC could not have achieved commercial gain by diverting Rearden's customers, if any, to RC's website:  even if users were likely looking for Rearden and not RC, RC could not have diverted consumers for commercial gain due to the parties' non-overlapping products

and services.  Moreover, even though it is undisputed that from December 2006 to June 2007, the two ReardenLLC domain names diverted web traffic to RC, RC mitigated its purported bad faith by voluntarily ceasing the diversion upon RC's request on June 6, 2007.  Perlman Dec. ¶ 9.  RC also mitigated its purported bad faith by offering to unconditionally transfer these domain names to plaintiff during oral argument on April 26, 2010.  This factor favors RC.

The sixth factor is the cybersquatter's "offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain . . . ." 15 U.S.C. § 1125(d)(1)(B)(i)(VI). RC offered to cease using the two ReardenLLC domain names in exchange for valuable consideration.  *Id.*, Exh. D.[9]  Specifically, RC offered to "voluntarily maintain the nondirecting nature" of some of the contested domain names if Rearden withdrew its May 2007 trademark applications—applications that included the term "Rearden *Commerce* Email" and were filed subsequent to the initiation of litigation.  *Id.* at 3 (emphasis added).  Although RC sought value for these domain names, it did so in the context of litigation, and not extortion.  This mitigates RC's actions as it did not act as a traditional cybersquatter, where a third party intentionally registers domain names in order to hold the mark owner hostage.  RC also made this offer after it ceased directing traffic from these sites.  Although it has continued to retain control of the domains and could resume using them at any time, at oral argument, RC offered to unconditionally transfer the ReardenLLC domain names to Rearden.  This action mitigated any attempt to improperly seek value for the domain names.  Thus, this factor favors RC.

The seventh factor is the cybersquatter's "provision of material and misleading false contact information when applying for the registration of the domain name . . . ." 15 U.S.C. § 1125(d)(1)(B)(i)(VII).  RC did not provide false information and readily admits that the domain names at issue redirected visitors to its main website, ReardenCommerce.com.  This factor is neutral.

The eighth factor is the cybersquatter's "registration or acquisition of multiple domain names which [it] knows are identical or confusingly similar to marks of others . . . ." *Id.*

11

United States District Court

For the Northern District of California

§ 1125(d)(1)(B)(i)(VIII).[10]  There is no doubt that the remaining domain names are identical or confusingly similar to Rearden's mark, to the extent such a mark exists.  According to one court, "Congress warned that the ACPA 'does not suggest that the mere registration of multiple domain names is an indication of bad faith.'  This is presumably because many companies legitimately register many, even hundreds, of domain names consisting of various permutations of their own trademarks in combination with other words.  'Just as they can have several telephone numbers, companies can register multiple domain names in order to maximize the chances that customers will find their web site.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 239 (4th Cir. 2002) (citations omitted).  Thus, registering multiple similar domain names here, where the domain names all incorporate some part of the alleged cybersquatter's company name, do not support a finding of bad faith.  Again, RC did not act as a traditional cybersquatter, where a third party intentionally registers multiple similar domain names that bear no relationship to that third party in order to hold the mark owner hostage.

The court also considers whether RC knew about the identity between the domain names it acquired and the marks of others.  It is undisputed that RC purchased both the ReardenLLC domain names after exchanging several emails with Rearden that had a subject line of "Re: Rearden LLC."  Although no reasonable jury could find that RC was unaware that plaintiffs were named Rearden LLC, no jury could find, based on the record before the court, that RC knew Rearden claimed ownership over the *mark* "Rearden LLC."  Plaintiffs also claim that RC registered the ReardenMobile and MobileRearden domains just three days after plaintiffs wrote RC that they were involved in "wireless technology."  Docket No. 249 (Levine Dec.), Exh. 16 (Letter) at 3.  This correspondence, however, listed plaintiffs as involved with such broad categories as "computer graphics," "Internet-based services" and dozens of other categories.  *Id.* at 3–4.  This provides no indication that RC knew that plaintiffs had a mark in ReardenMobile or MobileRearden.[11]  Plaintiffs also claim that RC registered ReardenC.com with knowledge that it was identical or confusingly similar to their mark.  Plaintiffs sent RC a letter on June 11, 2007 demanding that RC stop cybersquatting on ReardenC.com, which defendant did not own at the time.  Perlman Dec, Exh. C

(Letter).  The very next day, RC registered ReardenC.com knowing that plaintiffs claimed rights to this mark.  However, at this time, the parties were embroiled in this litigation and RC disputed Rearden's claim of ownership over the "Rearden" mark.  Upon acquiring the ReardenC.com domain, RC informed Rearden that:  "[a]s [ReardenC.com] was publicly available, and your client chose not to purchase it, Rearden Commerce has since acquired the domain name – since the 'c' after 'rearden' in the domain name serves as an abbreviation for the term 'commerce'."  Perlman Dec., Exh. D. Moreover, RC correctly claims it registered the ReardenC.com domain name because it "could be leveraged in multiple ways.  For Rearden Commerce, Rearden company, Rearden corporation . . . ." Docket No. 267 (O'Shea Opposition Dec.), Exh. 2 (Sandoval Depo.) at 222:4–22.  Consequently, RC's registration of ReardenC.com is insufficient to demonstrate knowledge of plaintiffs' actual ownership of the mark.  Thus, the eighth factor too favors RC.

In sum, the ACPA factors demonstrate that the ReardenMobile, MobileRearden and ReardenC.com domain names were not acquired in bad faith.  Summary judgment is therefore granted in favor of defendant with respect to these domain names.  With respect to the ReardenLLC domain names, all ACPA factors, save one, favor RC.  This is sufficient for the court to conclude, as a matter of law, that the ReardenLLC factors were not acquired in bad faith.  Nonetheless, the court now discusses the unique circumstances of this case.

B.      Unique circumstances

RC contends it registered the ReardenLLC domain names as part of its branding program to register domain names that Internet users might type into a browser when they are trying to reach RC's primary website.  Sandoval, RC's general counsel, testified that:

> Q. Okay. And so you went out while you were waiting to hear back from counsel for Mr. Perlman and got two URLs[,] both of which included and included only the names of his company; is that correct?
>
> A. Yes, *we had procured several URLs to protect our brand and to direct people to our site in connection with our services*.  I think we've gone – how many URLs have we gone over?  There was the [M]arch mass of tranches of URLs we reviewed earlier today.  We have -- I mean, is it tens of URLs that are *variations of Rearden and something*.  So, yes, at that point in time, there was -- I found out that there's a party opposing my trademark application that I feel has no right to oppose my trademark application, and I need to protect my mark, and I need to -- and those were two marks that I hadn't obtained in the past.

**United States District Court**
For the Northern District of California

1   JSUF ¶ 25 (emphases added).

2       It is clear that RC's general counsel ordered these domains be purchased immediately after

3   learning that Rearden might oppose RC's trademark applications.  Notwithstanding the timing, RC

4   claims to have acquired the ReardenLLC domain names in connection with its long-standing

5   program for registration of "variations of Rearden."  This assertion finds ample support in the

6   record.  *See* Docket No. 256 (O'Shea Moving Dec.), Exh. B at 5–6 (listing scores of domain names

7   that include the word "Rearden," common misspellings or alternate spellings).  Indeed, many of

8   these variations of Rearden are the subject of this order.  RC also admits that there was "no written

9   policy" for registering domain names, "processes were informal," and "there was no rhyme or

10  reason to it."  JSUF ¶ 34.  This comports with RC's argument that it registered "relevant domain

11  names when someone thought of them and brought them to the attention of the appropriate person"

12  and can negate the suspicious timing of the ReardenLLC domain registrations.  Docket No. 277

13  (Reply) at 9:26–27.  Thus, a jury could find that RC had not earlier considered the ReardenLLC

14  domain names during its initial registration frenzy, registered them when it became aware of the

15  potential domain names, and registered them as part of its long-standing program.  This

16  interpretation would not support a finding of bad faith.

17      Moreover, RC's immediate cessation of use of the ReardenLLC domain names when the

18  alleged cybersquatting activity was brought to RC's attention demonstrates good faith.  Docket No.

19  73 (Sandoval Dec.) ¶ 4.  RC's belief that it, and not Rearden, is the proper mark owner also militates

20  in favor of a lack of bad faith.  Finally, RC's recent offer to unconditionally transfer the

21  ReardenLLC domain names to Rearden conclusively demonstrates RC's good faith.  In light of RC's

22  offer, it is unclear why Rearden has chosen to continue litigating this issue.

23      Under the totality of circumstances, Rearden has not raised a triable issue of fact regarding

24  whether the ReardenLLC domain names were acquired in bad faith.  Summary judgment is therefore

25  granted in favor of defendant with respect to the ReardenLLC domain names.  Consequently,

26  summary judgment is granted in favor of defendant with respect to all the ACPA claims.  No

27  reasonable jury could find bad faith with respect to any of the domain names at issue in this order,

28

14

1   including the ones registered prior to July 2005[12] because the bad faith analysis with respect to those

2   domain names is essentially identical to that of ReardenC.com analysis above.[13]

3   III.   Unfair competition

4        California's Unfair Competition Law ("UCL") defines unfair competition as "any unlawful,

5   unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Plaintiffs'

6   arguments regarding the unlawful prong of the UCL are identical to their cybersquatting arguments;

7   thus, for the reasons stated above, summary judgment on this prong is granted in favor of defendant.

8        To determine whether a business practice is "unfair," "the court must weigh the utility of the

9   defendant's conduct against the gravity of the harm to the alleged victim."  *State Farm Fire & Cas.*

10  *Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1103-04 (1996).  Here, plaintiffs have presented no

11  evidence of harm, save their argument that the cybersquatting "likely impacted Rearden LLC's

12  ability to connect with potential clients, investors, members of the media, and jobseekers."  Docket

13  No. 276 (Reply) at 11:11–17.  Pure argument, with no supporting evidence, is insufficient to meet

14  the summary judgment standard.  Moreover, in light of the court's prior ruling that there does not

15  exist a strong likelihood of confusion, it is unclear how this misdirection was "unfair."  Indeed, it is

16  unclear whether plaintiffs suffered any harm whatsoever from RC's actions.  Consequently,

17  summary judgment on this prong is granted in favor of defendant.

18       The same rationale holds for the UCL's "fraudulent" prong.  The lack of a strong likelihood

19  of confusion can defeat the potential for deception.  Thus, summary judgment for plaintiffs is

20  unwarranted, and is granted in favor of defendant.

21

22  CONCLUSION[14]

23       For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED and

24  defendant's motion is GRANTED.

25       IT IS SO ORDERED.

26  Dated: July 1, 2010

                                        _____

27                                       MARILYN HALL PATEL
                                   United States District Court Judge
                                   Northern District of California

28

**United States District Court**
For the Northern District of California

15

**ENDNOTES**

1.      An exhaustive background regarding the parties is available in this court's January 27, 2009 order.  *See* Docket No. 235 (Infringement Order) at 2–5.

2.      The statute states, in its entirety:
A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
(ii) registers, traffics in, or uses a domain name that--
(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

3.      Plaintiffs argue that the Patent and Trademark Office only requires one example of use in commerce when evaluating a purported mark.  *See* Trademark Manual of Examining Procedure § 904.01 (6th ed.), available at http://tess2.uspto.gov/tmdb/tmep.  That may be so, however, a common law mark must nonetheless meet the standards set forth by case law.

4.      At oral argument, plaintiffs claimed their first use was on February 23, 2005.  *See* Docket No. 240 (Gabl Dec.), Exh. 6 (Trademark Status Report for "Rearden Studios").  The mere fact that the trademark status report for "Rearden Studios" states that plaintiffs' first use was on February 23, 2005 does not make it so.  Plaintiffs do not provide evidence of actual use in commerce on or prior to that date.

5.      Plaintiffs argue that newspaper articles constitute "use in commerce" because case law holds that they do not constitute "prior use."  *See T.A.B. Sys. v. PacTel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996); *Old Swiss House, Inc. v. Anheuser-Busch, Inc.*, 569 F.2d 1130, 1133 (C.C.P.A. 1978) (rejecting news articles as evidence of "prior use" because the mark "was buried in the body of the articles"); *Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001) (rejecting articles because they were between 16 and 64 pages in length, yet still "refer[ed] only once" to the mark).  Plaintiffs' conclusion does not follow.  Simply because newspaper articles do not meet the "prior use" standard does not mean they meet the "use in commerce" standard.  Indeed, plaintiffs provide no case law holding that newspaper articles do in fact meet the "use in commerce" standard.

6.      It appears that the DVD was not released until the year 2007.  Even if the DVD was released prior to July 2005, plaintiffs could not use it to demonstrate the sale or advertising of their services, as the DVD cover is an advertisement for the DVD itself, and not for Rearden's services.

7.      Defendant concedes that Rearden's predecessor commissioned and distributed invitations that included the Rearden Steel mark.  Specifically, "[t]he invitations included a Nintendo Game Boy® in a box on which the Rearden Steel mark was placed, and a video game cartridge having the Rearden Steel mark.  When the video game cartridge was inserted into the Game Boy®, the Game Boy® displayed moving graphics referring to 'Rearden Steel.'"  JSUF ¶ 48.

16

United States District Court

For the Northern District of California

8.      Trademark protection prior to actual sales may also be afforded where the totality of circumstances establishes a right to use the trademark. *See Chance*, 242 F.3d at 1158–59 ("[T]rademark rights can vest even before any goods or services are actually sold if the totality of one's prior actions, taken together, can establish a right to use the trademark." (citations omitted)); *see also Brookfield*, 174 F.3d at 1052 (prior use is "[u]se in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark" (quoting *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1200 (9th Cir. 1979))). Plaintiffs, however, do not contend that their trademark rights vested through use prior to actual sales.

9.      RC need not have had the intent to profit from the domain names when it registered the ReardenLLC domain names. Although defendant may not have registered the domain name with a bad faith intent to profit, it can nonetheless face liability for "use" or "traffic" in the domain names subsequent to the acquisition if done with a bad faith intent to profit. *Bosley*, 403 F.3d at 681.

10.     The parties agree that the final factor regarding distinctiveness and fame is not relevant.

11.     Plaintiffs have also failed to present any evidence regarding use in commerce of the marks "ReardenMobile" and "MobileRearden."

12.     The ReardenInc.net, ReardenInc.org, ReardenInc.us, ReardenCo.com, ReardenCo.net, ReardenCo.org, ReardenCo.us, ReardenC.net, ReardenC.org and ReardenC.us domain names.

13.     Plaintiffs claim RC registered the ReardenCo and several ReardenC domains with knowledge that RC did not have rights to "Rearden." Even if true, knowledge that defendant did not have rights to the mark is not akin to having knowledge that plaintiffs claimed ownership of these marks as of March 4, 2005, when RC registered these domain names. Similarly, knowledge that a California corporation already existed with the name "Rearden Inc." does not demonstrate that RC had knowledge that the corporation claimed ownership of the ReardenInc mark, or that the corporation used the mark in commerce.

14.     Plaintiffs' motion to seal, Docket No. 252, is denied as moot. Plaintiffs' evidentiary objections, Docket No. 271, are all denied as moot because the court did not rely upon any of the objected-to evidence in reaching its decision.

17